IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

SULPHUR MANOR, INC. d/b/a            )
CALLAWAY NURSING HOME,               )
                                     )
                                     )
            Plaintiff,               )
                                     )
v.                                   ) Case No. 6:15-cv-00250-RAW
                                     )
(1)  SYLVIA BURWELL, in her official capacity  )
as Secretary of Health and Human Services,     )
United States Department of Health and Human   )
Services; and                        )
(2)  NICO GOMEZ, in his official capacity as   )
Chief Executive Officer, Oklahoma Health Care  )
Authority,                           )
                                     )
            Defendants.              )

VERIFIED COMPLAINT FOR DECLARATORY RELIEF,
PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, AND
TEMPORARY RESTRAINING ORDER

COMES NOW Plaintiff Sulphur Manor, Inc. d/b/a Callaway Nursing Home ("Callaway"), by and through its counsel of record, Gibbs, Armstrong, Borochoff, Mullican & Hart, P.C., and files this Verified Complaint for Declaratory Relief, Preliminary and Permanent Injunctive Relief, and Temporary Restraining Order against Defendants Sylvia Burwell and Nico Gomez, in their official capacities (collectively, "Defendants"), alleging as follows:

NATURE OF THE ACTION

1.     Callaway is a skilled nursing facility located in Sulphur, Oklahoma that currently provides care to seventy-two (72) residents.  Approximately fifty-two (52) of

Callaway's residents are beneficiaries of the Medicaid program, which is a federal-state program designed to provide medical care to low-income and disabled individuals. Three (3) of Callaway's residents are beneficiaries of the Medicare program, which is a federal program designed primarily for the elderly.

2.     The Federal Centers for Medicare and Medicaid Services ("CMS") recently notified Callaway that its Medicare and Medicaid provider agreements will be involuntarily terminated due to Callaway being cited for two (2) deficiencies during a June 11, 2015, inspection survey. In doing so, CMS acknowledged there was no immediate jeopardy to any residents' health or safety. Also, the evidence will show the surveyor was incorrect in her factual findings that led to the two (2) deficiencies.

3.     As a result of the termination of Callaway's provider agreements, Callaway will stop receiving Medicare and Medicaid payments on July 8, 2015. That, in turn, will have devastating consequences on Callaway, its residents and its employees. Callaway will be forced out of business and its residents will be forced to relocate from their home of many years to other facilities. This will also cause them what is commonly known as "transfer trauma" – a medically recognized condition.

4.     Callaway has filed this civil action for declaratory and injunctive relief in which Callaway seeks: (a) a declaration that Defendants violated Callaway's constitutional and statutory rights, and that Defendants acted outside the scope of their authority, in conjunction with their decision to terminate Callaway's Medicare and Medicaid provider agreements; (b) an injunction preventing Defendants from terminating and/or stopping reimbursement payments pursuant to Callaway's provider agreements

2

until Callaway has been afforded a hearing and adjudication of its claims as stated herein; and (c) an injunction preventing Defendants from involuntarily relocating the residents of Callaway during the pendency of such adjudication absent further Order from this Court.

5.      The injunction Callaway seeks is limited in scope and duration.  Callaway does not ask this Court to adjudicate the validity of CMS's decision to terminate Callaway's provider agreements, even though Callaway contends this decision was erroneous.   Instead, through this action, Callaway asks this Court to: (a) review the unauthorized termination remedy Defendants have ordered; and (b) preserve the status quo so that Callaway can have a meaningful opportunity to mount a defense through the administrative appeals process.

6.      This Court is appropriate, and indeed, the only forum for Callaway to obtain the immediate relief it seeks.  Callaway has administratively appealed and sought expedited review of the Defendants' decision, but that review will not occur before Callaway's provider agreements are terminated.   Nor does the administrative process offered by CMS give the Administrative Law Judge ("ALJ") authority to grant a temporary or preliminary injunction or stay the termination pending administrative review.

7.      As noted, Callaway was written-up for two (2) deficiencies discovered during the June 11, 2015 survey.  In regards to one of the deficiencies, the evidence suggests that the Surveyor failed to properly investigate whether a meatball actually violated Resident 14's order for a therapeutic diet.  Next, the Surveyor cited Callaway for

3

lack of an administrator, even though one had been hired three (3) days prior on June 8, 2015.

## JURISDICTION AND VENUE

8.      This action arises under the Social Security Act, 42 U.S.C. §§ 301, *et seq.*, implicating both the Medicare Act, 42 U.S.C. §§ 1395 *et seq.*, and the Medicaid Act, 42 U.S.C. §§ 1396, *et seq.*, as well as the Fifth and Fourteenth Amendments to the United States Constitution.

9.      This Court has subject-matter jurisdiction over this action and the parties thereto pursuant to 28 U.S.C. § 1331 and the Court's inherent equity powers and its power to preserve its own jurisdiction.  Callaway is also entitled to the judicial relief it seeks pursuant to the Administrative Procedure Act, 5 U.S.C. § 705, and the All Writs Act, 28 U.S.C. § 1651.

10.     This action is not subject to the administrative exhaustion requirements of 42 U.S.C. §§ 405(g)-(h), and that requirement is waived in this situation because Callaway's claim for declaratory and injunctive relief is: (1) completely collateral to a substantive claim of entitlement; (2) colorable in its showing that denial of relief will cause irreparable harm; and (3) one whose resolution would not serve the purposes of exhaustion. *Mathews v. Eldridge*, 424 U.S. 319, 330-331 (1976); *see also Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 24 (2000) ("a court can deem [the procedural steps set forth in § 405(h)] waived in certain circumstances … even though the agency technically holds no 'hearing' on the claim.") (internal citations omitted).

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

## PARTIES

12.    Plaintiff Callaway is duly licensed to provide skilled nursing services at its facility located at 1300 West Lindsay, Sulphur, Oklahoma 73086.

13.    Defendant Sylvia Burwell, ("Secretary Burwell") is the Secretary of Health and Human Services, United States Department of Health and Human Services ("HHS"). Secretary Burwell is the federal official responsible for administering the Medicare Act, 42 U.S.C. §§1395-1395iii, as well as overseeing federal responsibilities under the Medicaid Act, 42 U.S.C. §§ 1396-1396w.  Although Secretary Burwell has delegated many of those responsibilities to CMS, she retains statutory responsibility for the official actions complained of herein.  Secretary Burwell's business address is 200 Independence Avenue, Southwest, Washington, District of Columbia 20201.

14.    Defendant Nico Gomez is the Chief Executive Officer of the Oklahoma Health Care Authority, which is the single state agency responsible for the administration of Oklahoma's Medicaid program and the payment of claims thereunder.  Mr. Gomez's business address is 2401 Northwest 23rd Street, Suite 1A, Oklahoma City, Oklahoma 73107.

15.    The Federal Government's sovereign immunity does not preclude the claims asserted against Secretary Burwell because this is "an action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."  5 U.S.C. § 702.  Furthermore, under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), neither sovereign immunity nor the Eleventh Amendment to

the United States Constitution preclude Callaway's claims for injunctive relief against Mr. Gomez.

## FACTUAL BACKGROUND

### A.    Medicare and Medicaid Conditions of Participation

16.    The Medicare program, established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395iii, is a federally-administered and funded program that provides payment for skilled nursing facility services to millions of aged or disabled individuals. 42 U.S.C. § 1395c.

17.    The Medicaid program, established by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w, is a joint federal-state program that provides medical assistance to low-income people who are aged, blind, disabled, pregnant, young children, or members of families with dependent children.  42 U.S.C. § 1396.  The Medicaid program is jointly funded by the Federal Government and each participating State.

18.    Nursing homes that participate in the Medicare program are termed skilled nursing facilities ("SNFs"), whereas nursing homes that participate in the Medicaid program are termed nursing facilities ("NFs").  Facilities such as Callaway that participate in both the Medicare and Medicaid programs are described as "dually-certified."  CMS's determination of noncompliance for dually-certified facilities controls for purposes of both the Medicare and Medicaid programs.  42 U.S.C. § 1396r(i); 42 C.F.R. § 488.330(a)(1)(i)(D).

19.    In order to receive payments under Medicare and/or Medicaid, a nursing facility like Callaway periodically must be certified as meeting certain minimum

6

requirements.  42 U.S.C. § 1395i-3(a)(3), (b)-(d); 42 U.S.C. § 1396r(a)(3), (b)-(d); 42 C.F.R. pt. 483, subpt. B.  A facility that is certified then enters into a provider agreement with the Federal Government and/or the State.  42 U.S.C. §§ 1395cc(a), 1396a(a)(27).

**B.    Survey Procedures and Remedy Determinations**

20.    CMS is responsible for conducting periodic on-site inspections of facilities to determine whether they meet federal requirements and thus are eligible to participate in the Medicare and Medicaid programs.  42 U.S.C. §§ 1395i-3(g), 1396r(g).  These on-site inspections are commonly known as "surveys."  If it is determined through surveys that a previously certified facility no longer meets participation requirements, various sanctions may be imposed.  42 U.S.C. § 1395i-3(g), (h); 42 U.S.C. § 1395cc(b)(2); 42 U.S.C. § 1396a(a)(33)(B); 42 U.S.C. § 1396r(h).

21.    Secretary Burwell has delegated significant responsibilities under the Medicare and Medicaid Acts to CMS.  CMS, in turn, contracts with state agencies to conduct surveys on CMS's behalf.  42 U.S.C. § 1395aa.  The state agency then forwards its survey findings and recommendations to CMS.  *Id.*; 42 C.F.R. § 488.12.  CMS makes certification and remedy determinations for most facilities based upon the recommendations of state survey agencies.  In Oklahoma, the state survey agency is OSDH.

22.    The Medicare and Medicaid Acts set forth specific requirements that nursing homes must satisfy in order to participate in the Medicare and Medicaid programs.  They also establish procedures for CMS and/or state survey agencies to

7

conduct surveys of facilities, and establish enforcement provisions for facilities not meeting the applicable requirements for participation.

23.     Surveys to determine compliance are generally performed by state survey agencies according to the procedures set forth in a document called the State Operations Manual.  The State Operations Manual is a compilation of guidelines that CMS publishes as instructions to state survey agencies.  One of the purposes of the State Operations Manual is to assist the survey team in making findings regarding whether the facilities are in "substantial compliance" with the relevant regulatory provisions.   The term "substantial compliance" is defined as a "level of compliance with the requirements of participation such that any identified deficiency poses no greater risk to resident health or safety than the potential for causing minimal harm."  42 C.F.R. § 488.301.

24.     Failure to adhere to the federal participation requirements results in "deficiencies."  Deficiencies are correlated to certain regulatory references called "tags" under Appendix P of the State Operations Manual.   When a deficiency is cited by a survey team, the facility is informed of the deficiency by reference to the "tag" corresponding to the deficiency cited.  Tag numbers range from F150 to F522 and are linked to the specific regulations and participation requirements located in 42 C.F.R. pt. 483.

25.     Deficiencies are further characterized by "scope" and "severity" ratings.  42 C.F.R. § 488.408.

26.     Nursing homes with "A, B, or C" deficiency ratings are still in "substantial compliance."  "D, E, and F" deficiencies pose no actual harm, with potential for more

8

than minimal harm to residents. "G, H, and I" deficiencies constitute actual harm that does not rise to the level of immediate jeopardy to a resident's health and safety. "J, K, or L" deficiencies represent deficiencies that have caused or are likely to cause immediate jeopardy to a resident's health and safety.

27.    Deficiency ratings are further classified in terms of "scope" as isolated, pattern or widespread based on the extent to which such practices will affect few, many or all residents, respectively.  For example, a "G" level deficiency has a severity of "actual harm that does not rise to the level of immediate jeopardy" but it is "isolated" in scope, affecting only one or few residents.

28.    CMS has the authority to impose a wide variety of remedies against any facility that is found to have deficiencies.  Remedies are generally assigned according to the scope and severity rating of the deficiencies identified in the survey, and CMS's determination of what enforcement remedy is needed to produce compliance.  42 C.F.R. § 488.408.  The Medicare and Medicaid Acts specifically tie individual remedies and groups of remedies to the severity of the non-compliance (i.e. immediate jeopardy versus non-immediate jeopardy situations).  42 U.S.C. §§ 1395i-3(h), 1396r(h).

29.    Remedies can include temporary management, denial of payment, civil monetary penalties, state monitoring, transfer of residents, and termination with transfer of residents to other nursing homes.  42 C.F.R. § 488.406.

**C.    OSDH and CMS Share Joint Responsibility for Surveys**

30.    As stated above, OSDH is the state agency in Oklahoma responsible for surveying health facilities that participate in the Medicare and Medicaid programs.

9

31.     Under its responsibilities to CMS, OSDH must conduct a standard survey of each SNF and NF not later than fifteen (15) months after the last day of the previous studied survey. 42 C.F.R. § 488.308. In addition to these so-called "annual" surveys, OSDH also investigates "complaints" of violations of participation requirements and may monitor compliance with those requirements. 42 C.F.R. § 488.332. "Complaints" include incidents that are self-reported by nursing homes under state or federal regulations, as well as reports from third parties. OSDH "conducts onsite monitoring . . . as necessary . . . when (1) a facility is not in substantial compliance with the requirements and is in the process of correcting deficiencies; (2) a facility has corrected deficiencies and verification of continued substantial compliance is needed; or (3) the Survey agency has reason to question the substantial compliance of the facility with a requirement of participation." 42 C.F.R. § 488.332.

32.     The findings from OSDH surveys are delivered in written form to the nursing facilities in a report known as a "Statement of Deficiencies," which is often called a "2567" because of its official title, 'CMS Form-2567." In nearly all cases, nursing facilities are given a certain period of time in which to file a document known as a "Plan of Correction" that is designed to specifically address deficiencies cited in the Statement of Deficiencies. The survey agency evaluates the Plan of Correction and, if the plan is determined to likely result in the correction of a facility's deficiencies, the survey agency accepts the Plan of Correction.

**D.    Procedural Issues - Medicare**

33.    Under federal law, nursing facilities are entitled to a hearing before an ALJ within HHS's Departmental Appeals Board ("DAB") to contest CMS's determination of noncompliance.  42 U.S.C. § 1320a-7a(c)(2).  The ALJ cannot review whether CMS had the statutory authority to terminate a provider agreement, nor can the ALJ question the remedy selected by CMS.  *See* 42 C.F.R. §§ 488.408(g)(2), 498.3(d)(11).

34.    A facility that is dissatisfied with the ALJ's ruling may appeal to the Appellate Division of the DAB.  42 C.F.R. § 498.5(c).  In cases involving the termination of Medicare and Medicaid provider agreements, if the facility is dissatisfied with the Appellate Division's decision, the facility may then file an action for judicial review in the district court of the United States for the judicial district in which the facility resides. 42 U.S.C. § 11395cc(h)(1).

35.    There is no process in place that guarantees an appellate decision prior to the termination of the provider agreement.  Indeed, Callaway's provider agreements will be terminated before an appeal is heard by the DAB.

**E.    Events Leading to this Litigation**

36.    Based on a resident complaint, the OSDH conducted an initial survey of Callaway on January 8, 2015 and discovered several deficiencies.  The OSDH conducted revisits to determine whether Callaway corrected the deficiencies on March 20, 2015, May 5, 2015, and again on June 11, 2015.

37.     On March 9, 2015, the OSDH issued a letter to Callaway stating it would make the recommendation to CMS to terminate its provider agreement if Callaway was not in "substantial compliance" by July 8, 2015.

38.     On May 29, 2015, the OSDH issued a letter stating that if Callaway "failed to achieve substantial compliance [by the June 5 [sic], 2015 revisit], the remedy(ies) will continue until such time as you achieve substantial compliance." (The actual revisit date was June 11, 2015.)

39.     During the June 11, 2015 revisit, the OSDH found Callaway had cleared all prior deficiencies. However, the OSDH found two (2) new deficiencies that allegedly violated CMS and OSDH guidelines, which are based on substantially similar factual findings. The deficiencies (tags) can be grouped as follows: (1) F365 (CMS) & LL863 (OSDH); and, (2) F493 (CMS) & LL902 (OSDH).

**F.     Factual Background Relating to Tags F365 (CMS) & LL863 (OSDH)**

40.     The F365 (CMS) tag is based off the alleged violation of 42 C.F.R. § 483.35(d)(3): "Food in Form to Meet Individual Needs: Each resident receives and the facility provides food prepared in a form designed to meet individual needs."

41.     The LL863 (OSDH) tag is based off the alleged violation of Okla. Admin. Code 310:675-9-12.1.(d)(1): "Diet – Meals: The facility shall provide a nourishing, palatable, well-balanced diet that meets the resident's daily nutritional and special dietary needs…."

42.     The OSDH found Callaway to be in violation of 42 C.F.R. § 483.35(d)(3) and Okla. Admin. Code 310:675-9-12.1.(d)(1) because Callaway served a meatball to

Resident 14 on June 10, 2015, which the OSDH alleges was in violation of Resident 14's therapeutic diet.

43.    Resident 14 had the following standing dietary order "Diet Δ LCS; ground meats" issued by his physician, Dr. John Tatom, on May 9, 2015.

44.    A "ground meats" diet is commonly recognized to contain food that is moist, soft-textured, and easily formed into a rounded ball in the mouth (bolus). The meatballs that were served to Resident 14 on June 10, 2015, are universally recognized as an acceptable part of a "ground meats" diet.

45.    Furthermore, both Callaway's dietician, Marilyn Rhodes, and Resident 14's treating physician, Dr. Tatom, who issued the dietary order, have signed affidavits stating that meatballs are part of a "ground meats" diet.

### G.    Factual Background Relating to Tags F493 (CMS) & LL902 (OSDH)

46.    The F493 (CMS) tag is based off the alleged violation of 42 C.F.R. § 483.75(d)(1)-(2): "Governing Body-Facility Policies/Appoint Administrator: The facility must have a governing body, or designated persons functioning as a governing body, that is legally responsible for establishing and implementing policies regarding the management and operation of the facility; and the governing body appoints the administrator who is licensed by the State where licensing is required; and responsible for the management of the facility."

47.    The LL902 (OSDH) tag is based off the alleged violation of Okla. Admin. Code 310:676-13-3: "Administrator – (a) The administrator shall be licensed by the State Board of Examiners for Nursing Home Administrators and has the authority and

responsibility for the total operation of the facility, subject only to the policies adopted by the governing authority. (b) The facility shall designate a person to act for the administrator during his/her absence. The designated person shall have the authority to exercise normal management responsibilities."

48.    On June 11, 2015, the OSDH found Callaway to be in violation of 42 C.F.R. § 483.75(d)(1)-(2) and Okla. Admin. Code 310:676-13-3 even though Callaway hired an administrator three (3) days prior on June 8, 2015. Furthermore, Carol Fernow, R.N., a nurse consultant, had assumed the management responsibilities of the facility upon the previous administrator's departure, and remained in that position during the administrator's absence.

**H.    Impending Violations of Callaway's Rights**

49.    First, as noted above, the OSDH surveyor had no factual support for her findings and improperly cited Callaway for two (2) deficiencies. Thus, Callaway was actually in "substantial compliance" as of June 11, 2015. In the alternative, even if Callaway was not in "substantial compliance" as of June 11, 2015, the prior correspondences from the OSDH assured Callaway it had until July 8, 2015 to achieve "substantial compliance". Callaway will have achieved "substantial compliance" by, or on, the July 8, 2015 date. The Departmental Appeals Board of the United States Department of Health and Human Services has held many times that CMS does not have the authority to impose or continue sanctions (other than a civil money penalty for past noncompliance) against a nursing facility that is in "substantial compliance" with the

14

Requirements of Participation. *See Foxwood Springs Living Center v. CMS*, DAB Dec. No. 2294 (2009), citing 42 C.F.R. §§ 488.417 and 488.454.

50. Second, Section 6501 of the Affordable Care Act requires States to terminate a provider's Medicaid agreement if such entity's participation in Medicare is terminated. The Act also provides that the earliest a State may terminate a Medicaid agreement is after all of that provider's appeals are exhausted. *See* 76 Fed. Reg. 5862, 5941. Callaway duly and timely appealed the termination of its Medicare provider agreement on July 2, 2015, and as a consequence has not exhausted its administrative remedies until said appeal is final. Defendants' actions in attempting to terminate Callaway's Medicaid provider agreement violates the Affordable Care Act and its implementing rules, and Callaway, its residents and employees, are being irrevocably harmed thereby.

51. Third, the Okla. Admin. Code 317:30-3-19.1 requires that Callaway be afforded "due process" protections when the OSDH takes an action affecting a contract with a provider. The sentinel requirement for "due process" includes a hearing. *Shamblin v. Beasley*, 1998 OK 88, ¶ 12, 967 P.2d 1200, 1209, as corrected (Jan. 28, 1999) (citations omitted). ("As the Constitution inexorably commands, no one's rights may be adversely affected in the absence of due and timely notice that affords a full and fair opportunity to defend.")

52. Fourth, under the Oklahoma and U.S. Constitutions, Callaway has a fundamental right to pursue its regulatory appeals and remedies in connection with the termination of the provider agreement, and until such appeals are exhausted, CMS and

the OSDH must not terminate its provider agreements. In terminating Callaway's provider agreements prior to the completion of the appeals process afforded to it by law, the Defendants have deprived Callaway of its right to due process in connection with its provider agreements. Further, the structure and timing of the termination and appeals process precludes Callaway from obtaining any effective relief. By the time the DAB hears the appeal, Callaway will be shut down.

**I.      Callaway's Efforts to Obtain Expedited Administrative Review**

53.     Prior to the filing of this action, Callaway filed a request for an expedited hearing before an ALJ with HHS's DAB, pursuant to 42 C.F.R. § 498.40.

54.     Unfortunately, the relocation of Callaway's Medicare and Medicaid residents will occur before any hearing takes place on the merits of Callaway's appeal unless this Court grants Callaway the injunctive relief it seeks.

**J.      Threat of Imminent Irreparable Harm to Callaway, its Residents and its Employees.**

55.     Under the circumstances, Callaway's administrative appeal rights do not afford an adequate remedy because the prescribed process cannot provide any meaningful relief in this instance. An expedited ALJ hearing has already been requested in this matter, but any decision on the merits by the ALJ or the DAB's Appellate Division will necessarily come after Callaway's Medicare and Medicaid residents have been involuntarily relocated to other facilities, after Callaway's Medicare and Medicaid payments have stopped, and after Callaway's doors have been closed. Therefore, any

16

such administrative decision will do nothing to redress the irreparable harm suffered by Callaway and its residents.

56.    With respect to Callaway's residents, the termination of Callaway's Medicare and Medicaid provider agreements will result in an immediate and involuntary relocation of nearly all Callaway residents to other nursing homes. This relocation effectively means that Callaway's residents, many of whom are disabled or infirm, will be forced to leave their home of many years at significant risk to their health and safety. Moreover, many Callaway residents have medical conditions or characteristics that will make it difficult to find facilities that are willing or able to take them.

57.    Furthermore, the termination of Medicare and Medicaid payments scheduled to take place on July 8, 2015, without a meaningful opportunity to challenge the merits of CMS's erroneous findings and unlawful termination order, will financially destroy Callaway. All but a fraction of Callaway's residents rely exclusively on Medicare or Medicaid reimbursement for the services they receive at Callaway. If Callaway's Medicare and Medicaid payments are ceased, Callaway will lose almost all of its revenue, forcing it to close and discharge its employees.

58.    The damage to Callaway's residents will be worse. Continuity of treatment is an important principle of health care – especially those with mental health issues who need stability. Residents establish relationships with nurses and health care professionals that are essential to their care and treatment. Callaway's residents, like most nursing home residents, are particularly fragile, both physically and emotionally. These residents will face difficulty in obtaining new placements. Moreover, the transfer itself in moving

some of these residents could result in increased health failure or possible death. Disruption for existing residents would likely cause harm that could not be repaired.

59.     The threat of irreparable harm to Callaway and its residents far outweighs any harm that might be suffered if injunctive relief is granted.  In fact, federal and state officials will not be harmed in any way by maintaining the status quo until after Callaway has had an opportunity to challenge CMS's findings at the administrative appeals level. The United States and Oklahoma must pay for Medicare and Medicaid benefits for Callaway's residents whether or not those residents remain at Callaway.  If the decision of the ALJ and/or the Appellate Division of the DAB favors Callaway, as Callaway expects, the threatened termination and forced involuntary transfer of residents will be properly averted.  But even if the appeals process favors federal and state authorities, then the transfer of the residents may still occur with no harm resulting to federal and state authorities by the delay.

60.     The injunctive relief requested by Callaway will not adversely affect the public interest.  The public interest is in no way served by an unwarranted, accelerated shutdown of a nursing home that provides care and treatment to numerous low-income, disadvantaged and disabled residents.  The public interest also would be disserved if these residents are forced to undertake an unnecessary and involuntary relocation at great risk to their health and safety when there is no commensurate showing that they are subject to immediate jeopardy at Callaway.  In short, the public interest cannot be served by shutting down a nursing home with alleged deficiencies that never even existed, and even if they did, do not actually pose any immediate harm to residents.

61.     This Court is the only forum for Callaway to obtain the relief it seeks. Callaway has appealed CMS's decision to terminate Callaway's provider agreements, but that review will not occur before the cessation of all Medicare and Medicaid payments, nor does the ALJ have the authority to grant a stay or postpone the effective date of the termination.  In short, for these important issues to be considered at all, they must be considered by this Court at this time in this litigation.

## CAUSES OF ACTION

### COUNT I:
### Violation of Due Process/U.S. Const. Amends. V, XIV § 1
### (Against all Defendants)

62.     Callaway adopts and incorporates by reference the allegations contained in the preceding paragraphs above as if set forth fully herein.

63.     Callaway's Medicare and Medicaid provider agreements and continued participation in these programs constitute valuable property rights within the meaning of the Fifth and Fourteenth Amendments to the United States Constitution.

64.     Defendants violated Callaway's right to due process by terminating Callaway's provider agreements even though Callaway is in "substantial compliance" and there is no "immediate jeopardy" to Callaway's residents, which is contrary to Defendants' statutory authority.  The provisions of the Medicare and Medicaid Acts do not give CMS and OSDH the authority to terminate Callaway's provider agreements under these circumstances.

65.     The administrative appeal process available to Callaway is insufficient to satisfy Callaway's right to due process in this situation.  Defendants' terminations of

Callaway's provider agreements and the cessation of Medicare and Medicaid reimbursement payments will financially devastate Callaway before it has a chance to participate in and challenge CMS's erroneous findings at an administrative hearing at the agency level.

## COUNT II:
### Declaratory Relief
### (Against all Defendants)

66.     Callaway adopts and incorporates by reference the allegations contained in the preceding paragraphs above as if set forth fully herein.

67.     An actual controversy of a justiciable nature presently exists between Callaway and Defendants as to whether:  (a) Defendants cited unlawfully and exceeded the scope of their authority under the Medicare and Medicaid Acts by terminating Callaway's provider agreements in the absence of a finding of "immediate jeopardy" to residents; (b) Defendants' failure to abide by Section 6501 of the Affordable Care Act that requires exhaustion of remedies prior to termination of the Medicaid provider agreement ; and (c) Defendants' adoption and ratification of unsubstantiated allegations of regulatory noncompliance and termination of Callaway's provider agreements violated Callaway's right to due process and/or the provisions of the Medicare and Medicaid Acts, the regulations promulgated thereunder, and/or Defendants' protocols, manuals, and guidelines.

68.     The issuance of declaratory relief by this Court will terminate the existing controversy between the parties because such a declaration will require Defendants to provide Callaway with all the relief it seeks in this lawsuit; specifically, an opportunity to

meaningfully challenge Defendants' findings that it failed to substantially comply with the requisite regulatory standards before Callaway's provider agreements are terminated.

## COUNT III:
### Injunctive Relief
### (Against all Defendants)

69.     Callaway adopts and incorporates by reference the allegations contained in the preceding paragraphs above as if set forth fully herein.

70.     Callaway is entitled to temporary, preliminary, and permanent injunctive relief pursuant to Fed. R. Civ. P. 65 for the reasons stated more fully above and for the additional reasons stated as follows:

a.     Callaway will suffer irreparable harm in the absence of injunctive relief and for which it has no adequate remedy at law or through the administrative appeals process.  Immediate termination of the provider agreements and cessation of Medicare and Medicaid payments, without a meaningful opportunity to challenge the merits of CMS's findings and unlawful termination order, will financially destroy Callaway. Almost all of Callaway's patients rely exclusively on Medicare and Medicaid reimbursement for the services they receive at Callaway.  If the provider agreements are terminated and reimbursement is stopped, Callaway will lose almost all of its revenue; it will be forced to close its doors and discharge its employees.

b.     The harm to Callaway's residents will be worse.  Continuity of environment and treatment is critical in providing healthcare and rehabilitation services. Residents establish relationships with nurses and healthcare professionals that are essential to their care and treatment.  Callaway's residents, like most nursing home

21

patients, are particularly fragile, both physically and emotionally. Some of Callaway's residents are physically disabled, developmentally disabled and/ or mentally challenged. Some are hospice patients. Most of Callaway's unique resident population will face difficulties in obtaining new placement. Moreover, the transfer itself in moving some of these residents will result in physical and emotional trauma, mental deterioration, increased health failure or possible death. Disruption for existing residents would likely cause harm that could not be repaired.

c.      The threat of irreparable harm to Callaway and its patients far outweighs any harm Defendants might suffer if injunctive relief is granted. In fact, Defendants will not be harmed in any way by maintaining the status quo until after Callaway has an opportunity to challenge CMS's authority to terminate the provider agreements as stated herein. Defendants must pay for Medicare and Medicaid benefits for Callaway's patients whether those patients remain at Callaway or are moved to another facility. If Callaway prevails, as it expects, the threatened termination and involuntary and harmful transfer of patients will be properly averted. Even if Defendants prevail, the transfer of patients may still occur with no harm resulting to Defendants by the delay.

d.      There is a strong likelihood that Callaway will prevail on the merits in establishing that Defendants violated its constitutional right to due process and further violated the Medicare and Medicaid Acts by ordering termination even though Callaway is in "substantial compliance" and there is no "immediate jeopardy" to Callaway's residents and by wrongfully issuing citations with no factual or legal basis.

e.     The injunctive relief requested by Callaway will not affect the public interest.  The public interest is in no way served by an unwarranted and accelerated shut-down of a nursing home that provides care and treatment to numerous low-income, disadvantaged and disabled patients.  The public interest would also be offended if these patients are forced to undertake an unnecessary and involuntary relocation at great risk to their health and safety.

## COUNT IV:
### Preservation of this Court's Jurisdiction to Adjudicate Dispute/5 U.S.C. § 705
### (Against all Defendants)

71.     Callaway adopts and incorporates by reference the allegations contained in the preceding paragraphs above as if set forth fully herein.

72.     In relevant part, the Administrative Procedure Act provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, *including the court to which a case may be taken on appeal . . .*, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added).

73.     As outlined above, Callaway has meritorious challenges to the actions taken by federal and state officials in this case, and will vigorously assert its arguments during the administrative appeals process that has already been initiated.  If immediate injunctive relief is denied, however, Callaway's right to judicial review in this Court will be eliminated by the inability of Callaway to remain in existence due to the termination

of all Medicare and Medicaid payments. Furthermore, Callaway's residents and employees will suffer irreparable harm in the absence of an injunction.

74.    Accordingly, pursuant to 5 U.S.C. § 705, issuance of the injunctive relief sought in this case is necessary and appropriate in order to preserve the Court's jurisdiction to review the result of the administrative appeals process related to the termination of Callaway's Medicare and Medicaid provider agreements.

## JURY DEMAND

75.    Callaway requests a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Callaway respectfully requests that the Court:

A.    Provide for expeditious proceedings in this action;

B.    Issue a temporary restraining order and preliminarily and permanently enjoin Secretary Burwell and Mr. Gomez, as well as their agents, servants, employees, successors and assigns, from terminating Medicare and Medicaid payments to Callaway until Callaway has been afforded a hearing on its administrative appeal, up to and including an appeal to the Appellate Division of the DAB;

C.    Declare that Defendants violated Callaway's constitutional due process and statutory rights, and otherwise exceeded their authority under the provisions of the Medicare and Medicaid Acts and regulations, as further described herein; and

D.    Award such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Daniel Aizenman*
Daniel N. Aizenman, OBA # 30971
daizenman@gabmh.com
Nick Larby, OBA # 21734
nlarby@gabmh.com
George Gibbs, OBA # 11843
ggibbs@gabmh.com
Robert D. Hart, OBA # 16358
rhart@gabmh.com
GIBBS, ARMSTRONG, BOROCHOFF,
MULLICAN & HART
601 South Boulder, Suite 500
Tulsa, Oklahoma 74119
Telephone (918) 587-3939
Facsimile (918) 582-5504

## VERIFICATION

I, Sam Jewell, being of lawful age, being first duly sworn upon oath, says:

That I am the owner of Plaintiff Callaway Nursing Home, above named; that I have read the foregoing Verified Complaint for Declaratory Relief, Preliminary and Permanent Injunctive Relief, and Temporary Restraining Order, and the contents thereof, and that the facts therein set forth are true and correct.

_____
Sam Jewell

Subscribed and sworn to before me this 6th day of July, 2015.

_____
NOTARY PUBLIC

(SEAL)

My Commission Expires: 06/15/2016

My Commission No. 04005379

OFFICIAL SEAL
KATHLEEN MAHER
Notary Public Oklahoma
Carter County
My Comm Exp 06/15/2016
Commission #04005379

## CERTIFICATE OF SERVICE

I hereby certify that a full, true and correct copy of the above and foregoing document

was served on the 7th day of July 2015, via:

| | |
|---|---|
| _____ | U. S. First Class Mail, proper postage prepaid; |
| ___XX___ | Certified Mail, Return Receipt Requested; |
| _____ | Facsimile |
| _____ | Hand Delivery |
| _____ | Overnight Express Delivery |
| _____ | E-mail |

to the following:

| | |
|---|---|
| Debbie A Belcher<br>Mervin Turner<br>Assistant Regional Counsel<br>Office of General Counsel<br>US Department of Health and Human Services<br>1301 Young Street, Suite 1138<br>Dallas, TX 75202 | Mark F. Green<br>United States Attorney<br>U.S. Attorney's Office for the Eastern<br>District of Oklahoma<br>520 Denison Ave.<br>Muskogee, OK 74401 |
| Loretta E. Lynch<br>Attorney General of the United States<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530 | E Scott Pruitt<br>Attorney General of Oklahoma<br>Office of the Oklahoma Attorney<br>General<br>313 NE 21st Street<br>Oklahoma City, OK 73105 |

/s/ Daniel N. Aizenman

_____

Daniel N. Aizenman